**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LESLIE MAUSAR, | ) | CASE NO. 1:17-cv-00464 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Leslie Mausar (hereinafter "Plaintiff"), challenges the final decision of

Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter

"Commissioner"), denying her applications for a Period of Disability ("POD"), Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has

jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

# I. Procedural History

On June 3, 2013, Plaintiff filed her applications for POD, DIB, and SSI, alleging a disability onset date of February 9, 2012. (Transcript ("Tr.") 242). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 77-148). Plaintiff participated in the hearing on June 16, 2015, was represented by counsel, and testified. (Tr. 42-76). A vocational expert ("VE") also participated and testified. *Id.* On July 27, 2015, the ALJ found Plaintiff not disabled. (Tr. 35). On January 9, 2017, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4). On March 7, 2017, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 14 & 15).

Plaintiff asserts the following assignments of error: (1) the ALJ erred in assessing the Plaintiff's credibility, and (2) the ALJ erred in her evaluation of Plaintiff's fibromyalgia. (R. 14).

# II. Evidence

## A. Relevant Medical Evidence[1]

### 1. Treatment Records

On January 23, 2012, Plaintiff was seen in the emergency room ("ER") at St. Francis Hospital in Columbus, GA for a headache and was diagnosed with a migraine. (Tr. 360-364).

On January 30, 2012, Plaintiff was seen by Terry Cone, M.D., for the first time. (Tr. 342). She complained of moles on her back and neck that she wanted removed. *Id.* She was 5'3" tall

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

and weighed 218 pounds. *Id*. Although she had only 8 of 18 positive tender points, Dr. Cone noted that Plaintiff's medical history supported a diagnosis of fibromyalgia, but wrote that he had not found the requisite 11 tender points. *Id*. Dr. Cone speculated that treatment for fibromyalgia may have moderated her symptoms. *Id*. There was also a diagnosis of migraines and insomnia. *Id*. Plaintiff indicated joint pain in her wrists, elbows, ankles, knees, spine, and hips. (Tr. 343). Plaintiff related that she could not perform her activities of daily living without difficulty. *Id*.

On March 23, 2012, Plaintiff told Dr. Cone that she had difficulty sleeping, and that Propranolol made her drowsy during the day even when she only took it at night. (Tr. 340).

On April 25, 2012, Plaintiff again reported to the ER complaining of a headache and a history of previous headaches. (Tr. 380). Plaintiff had full, normal range of motion in her extremities. (Tr. 382). She was discharged the same day and diagnosed with a migraine. (Tr. 383).

On June 4, 2012, Plaintiff was seen by Mark R. Sexton, M.D., for the first time seeking treatment for fibromyalgia. (Tr. 537). On examination, Plaintiff had no muscle aches or weakness and no arthralgia/joint pain, swelling in the extremities, or back pain. (Tr. 538). She ambulated normally. *Id*. Dr. Sexton diagnosed "migraine with aura without mention of intractable migraine without mention of status migrainosus; without mention of refractory migraine without mention of status migrainosus," as well as myalgia and mytosis, unspecified. (Tr. 539).

On July 21, 2012, Plaintiff again reported to the ER complaining of a migraine headache. (Tr. 347-348). She also complained of nausea and photophobia. (Tr. 348). Plaintiff had full, normal range of motion in her extremities. (Tr. 382). She was discharged the same day and

diagnosed with a migraine. (Tr. 351).

On September 1, 2012, Plaintiff again reported to the ER complaining of a migraine headache. (Tr. 354). She was discharged the same day, prescribed Vicodin, and diagnosed with a migraine. (Tr. 359).

On September 17, 2012, Dr. Sexton saw Plaintiff for right hip pain that started the previous day. (Tr. 526-527). A review of her musculoskeletal symptoms revealed "no muscle aches or weakness, and arthralgias/joint pain; swelling in the extremities, or back pain; **cont o** [sic] **have chronic pain, went to Rheum and was told her hip pain is not related to her fibromyalgia. She is also trying to get the pt off of narcotic pain meds but not having much success**." (Tr. 526) (emphasis in original). Dr. Sexton continued to diagnose myalgia and myositis, unspecified, and joint pain. (Tr. 527).

On November 4, 2012 and January 19, 2013, Plaintiff sought treatment for migraine headaches at the ER. (Tr. 365, 374)

On December 6, 2012, Plaintiff was seen at the Nexus Pain Center by Sung Chang, M.D. (Tr. 488-492). Plaintiff was diagnosed with sacroiliitis (primary), cervical disc degeneration, fibromyalgia, radicular syndrome of lower limbs, trochanteric bursitis, and headache, migraine. (Tr. 491). She was continued on Cymbalta for fibromyalgia. *Id*.

On December 14, 2012, Plaintiff was again seen by Dr. Chang. (Tr. 485-488). He assessed sacroiliitis and proceeded with bilateral SI joint injections for diagnostic and therapeutic purposes. (Tr. 486). Plaintiff's pre-operation pain was 7/10 lowered to 0/10 post-operatively. (Tr. 488).

On January 4, 2013, Dr. Chang administered a GTB injection for Plaintiff's trochanteric bursitis. (Tr. 479). On the same day, an MRI of Plaintiff's cervical spine yielded an impression

of a one mm ventral bulging disc, no focal disc herniation nor bony spinal stenosis, and no narrowing of bony spinal canal of less than 10 mm. (Tr. 494-495). An MRI of Plaintiff's lumbar was unremarkable. (Tr. 496-497). Nonetheless, on January 25, 2013, Dr. Chang noted that an MRI of Plaintiff's lumbar spine was "remarkable for a small disc protrusion L5-S1 level. (Tr. 472). Dr. Chang went ahead with right-sided transforaminal epidural steroid injections at the L5-S1 level. *Id.*

On February 19, 2013, Plaintiff was seen by Jonathan Liss, M.D., a neurologist, for her migraine headaches. (Tr. 432). Plaintiff told Dr. Liss that her headaches were "constant" and throbbing;" accompanied by nausea, photopobia, and phonophobia; and were "incapacitating." *Id.* Plaintiff reported that some months she experienced fifteen or more days of headaches, and other months she was headache-free. (Tr. 435). On examination, Plaintiff's muscle bulk, tone, and strength were all normal. (Tr. 436). Dr. Liss diagnosed migraines and prescribed Depakote for migraine prevention. (Tr. 437). Dr. Liss told Plaintiff that she was at risk for developing rebound headaches due to overuse of narcotics. *Id.* Plaintiff indicated that she understood but would, nevertheless, continue to use them for treatment of fibromyalgia. *Id.*

On March 21, 2013, Plaintiff again complained of pain all over her body. (Tr. 460). Dr. Chang diagnosed bursitis of the knee and fibromyalgia. (Tr. 462). On the same day, Plaintiff was seen again by Dr. Liss complaining of a headache and noting five total over the previous month of which four were severe. (Tr. 426).

On March 27, 2013, Plaintiff was seen for a follow-up and requested an adjustment to her medications. (Tr. 457). She denied any change in bowel or bladder function, any weakness/numbness in the lower extremities, and denied any sedation or impairment. *Id.*

On April 15, 2013, Plaintiff was seen by Dr. Liss and diagnosed with migraines, nausea and

vomiting, fibromyalgia, and morbid obesity. (Tr. 425).

On April 18, 2013 and April 25, 2013, Dr. Chang noted Plaintiff had "tender areas, both above and below the waist, bilaterally, on at least 11/18." (Tr. 452, 455). He noted the same presence of tender areas on May 2, 2013 and May 16, 2013. (Tr. 441-442 448).

On May 22, 2013, Dr. Liss wrote that the frequency of Plaintiff's headaches had decreased, with none over the past ten days. (Tr. 501). Her diagnosis remained unchanged. (Tr. 502).

On August 6, 2013, Plaintiff was seen by Kirstie Freeman, NPC. (Tr. 542-545). She had normal gait, and showed normal strength bilaterally in her upper and lower extremities. (Tr. 544).

On August 13, 2013, Plaintiff reported to Dr. Liss that her migraines had increased to about 20 days per month, most of which were "very bad." (Tr. 599). Dr. Liss also noted Plaintiff complained of blurred vision, vision change and visual disturbance; excessive daytime sleepiness; headache and speech difficulties; joint stiffness and back pain; and cold tolerance. *Id*. Dr. Liss stated that Plaintiff appears to be having "hypnic jerks," for which he prescribed Klonopin. (Tr. 601).

On January 7, 2014, Plaintiff was seen by Dr. Liss for Botox injections to treat her headaches. (Tr. 646). Plaintiff reported significant benefit from Klonopin for treatment of her hypnic jerks. (Tr. 648).

On January 17, 2014, Plaintiff presented for a planned right side joint injection in her knee. (Tr. 626). On January 31, 2014, she received a steroid injection. (Tr. 624). On February 7, 2014, Plaintiff was diagnosed with radicular syndrome of lower limbs, and again received a lumbar, transforaminal steroid injection. (Tr. 618-620). Dr. Chang noted the presence of crepitus on extension of the right knee. (Tr. 619). At a follow up on March 3, 2014, Plaintiff reported that

the right lumbar injections had reduced her pain by 98%, and that the injections in the left knee had yielded a 90% reduction in pain. (Tr. 644). However, Plaintiff reported that she could not tolerate further Suparz injections to the right knee. *Id.*

On April 1, 2014, Plaintiff reported to Dr. Liss that the Botox injections had not been helpful. (Tr. 650).

On May 2, 2014, Dr. Chang recommended a referral to a rheumatologist for pain in multiple joints. (Tr. 641).

On June 11, 2014, Plaintiff told Dr. Liss that her Atacand medication had failed to reduce the frequency of her migraines. (Tr. 654). At that visit, Dr. Liss performed another Botox injection. (Tr. 656). Plaintiff was also started on Keppra. *Id.*

On January 30, 2015, Dr. Chang noted normal gait, and normal strength bilaterally in the upper and lower extremities. (Tr. 709). Plaintiff was observed to have lumbar spinal pain with radicular pain consistent with the L5 dermatome and was administered an epidural injection. (Tr. 709-710).

On April 10, 2015, Dr. Chung noted that Ms. Mausar's low back pain had not returned since the last epidural steroid injections he had performed. (Tr. 835). She did, however, report radicular pain. *Id.*

On October 9, 2015, Plaintiff was seen by Dr. Sexton. (Tr. 851-52). Plaintiff was diagnosed with fibromyositis, chronic pain syndrome, and depressive disorder. (Tr. 852). Plaintiff reported "arthralgias/joint pain," but "no muscle aches, no muscle weakness, no back pain, and no swelling in the extremities … no sleep disturbance … no night sweats, no significant weight gain, no significant weight loss, and no exercise intolerance." (Tr. 851). On physical examination, she ambulated normally. (Tr. 852).

### 2. Medical Opinions Concerning Plaintiff's Functional Limitations

On February 10, 2011, Plaintiff underwent a psychological consultative examination at the request of the Bureau of Disability Determination. (Tr. 334). She was seen by clinical psychologist Richard Halas, M.A. *Id*. Mr. Halas assessed a Global Assessment of Functioning ("GAF") score of 55, indicative of moderate symptoms.[2] (Tr. 337). Mr. Halas found that Plaintiff had depressive disorder not otherwise specified, but her ability to follow through with simple instructions and/or directions, to maintain attention and concentration to perform simple/repetitive tasks, and to withstand the stresses and pressures associated with day-to-day work were not impaired. (Tr. 3370338). Her mental ability to relate to others, including fellow workers and supervisors, was mildly impaired. (Tr. 337).

On September 19, 2013, State Agency physician Glenn James, M.D., reviewed the record and determined that Plaintiff suffers from fibromyalgia and migraines. (Tr. 135-138). He opined that, in an 8-hour workday, Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand/walk for 6 hours, and sit for 6 hours. (Tr. 136). He did not find any postural, manipulative, visual, communicative, or environmental restrictions. *Id*. Dr. James explained that the assessed limitations were based on Plaintiff's pain symptoms to the extent they were credible, but noted that treatment notes found Plaintiff had normal "gait, neuro, motor function despite pain." (Tr.

---

2  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

136).

## B. Relevant Hearing Testimony

At the June 16, 2015 hearing, Plaintiff testified as follows:

• She lives with her husband and two minor children in a one-story apartment. She has not worked or applied for any jobs since February 9, 2012—her alleged onset date. (Tr. 46).

• She is 5'2" tall and weighs 200 pounds. Her weight has been stable. (Tr. 47).

• She has a driver's license and continues to drive. She is right-handed. (Tr. 47).

• Her migraines and fibromyalgia cause the most severe problems. (Tr. 47). She has suffered from the former since the 1990s. *Id*. She has five to ten days of migraines each month, which tend to come in clusters. (Tr. 48). Her migraines had been at the present intensity level for the past three to five years. *Id*. Her migraine medications cause her to feel extremely sleepy, so she lies down after taking her medication. (Tr. 48-49). She also experiences vomiting, nausea, and occasionally blindness during a migraine. (Tr. 49). She classifies her migraine pain as a ten on a zero to ten scale. (Tr. 51).

• She has suffered from fibromyalgia for ten years, and it has progressively worsened. It began in her hands and she now has it in her entire body. It has been that way for six or seven years. (Tr. 50). She has pain all over her body every day, all day. (Tr. 51). She classifies her fibromyalgia pain intensity as a seven or eight out of ten even with medication. *Id*.

• She also suffers from depression and anxiety. (Tr. 51). These cause her difficulty with her memory. (Tr. 52). She has been prescribed Cymbalta. *Id*. She has not seen a psychologist or psychiatrist since 1999 or 2000. (Tr. 53).

• She also has degenerative disc disease, experiences sciatic nerve pain, and has little cartilage in her knees. (Tr. 54). She receives injections for her pain. *Id*. Her back pain has been constant for the past five to six years, which she rates a seven in its intensity. Her hip pain comes and goes with the epidural injections. (Tr. 55). She ranks her hip pain a ten prior to injections. The first injection helped for a year, but subsequent injections have not worked as well. (Tr. 56). Her knee pain is also constant, which she classifies as a six in its intensity. (Tr. 60).

• She can stand/walk for ten minutes. (Tr. 60). She can sit ten, perhaps for twenty minutes at a time. (tr. 61). She can lift her daughter, who weighs forty pounds. (Tr. 61).

• She does not require help bathing or getting dressed. (Tr. 61). She can cook quick, simple meals. She performs limited grocery shopping when she needs only a few basic items. (Tr. 62). She occasionally washes dishes, vacuums, sweeps, and does the laundry. *Id*. She will

clean the sink and counter-tops, but leaves the bigger chores for her husband. (Tr. 63).

The VE classified Plaintiff's past relevant work as follows: delivery truck driver, Dictionary of Occupational Titles ("DOT") 905.663-014, heavy and semi-skilled with an SVP of 4;[3] sales person, DOT 279.367-054, light, semi-skilled with an SVP of 2; general clerk, DOT 209.562-010, light and semi-skilled with an SVP of 3; and, painter, DOT 940.381-010, medium and semi-skilled with an SVP of 7. (Tr. 67-68, 71).

The ALJ posed the following hypothetical question to the VE:

> Assume for purposes of the first hypothetical an individual with the claimant's same vocational profile is one who could do a range of light work activity as defined by the Social Security regulations… Let's say should have a sit stand option at 16 minute intervals throughout the day, no operation of foot controls, no climbing stairs, ladders, ropes, or scaffolds, no kneeling, crouching, or crawling, no excessive vibration, unprotected heights or hazardous machinery, would limit her to unskilled work with no more than occasional direct interaction with the general public.

(Tr. 68). The VE testified that such an individual could not perform Plaintiff's past relevant work. (Tr. 68-71). However, the VE identified the following jobs that such an individual with the aforementioned limitations could perform: mail clerk, DOT 209.667-026 (18,000 jobs nationally); ticket seller, DOT (10,000 jobs or more nationally); and, laundry folder, DOT 369.687-018 (16,000 jobs nationally). (Tr. 72-73).

The ALJ posed a second hypothetical keeping "the same vocational profile as Exhibit 7B, can perform sedentary work," with "no operation of foot controls, no climbing stairs, ladders, ropes, scaffolds, no kneeling, bouncing, crawling, no excessive vibration, unprotected heights, hazardous machinery, as well as stick to unskilled work activity with no more than

---

[3] The VE initially identified this position as a courier, DOT 230.663-010, light and unskilled, but changed her testimony after further clarification from Plaintiff as to her job duties. (Tr. 69-71).

occasional direct contact with the general public." (Tr. 73). The VE identified the following jobs that such an individual could perform: final assembler, DOT 713.687-018 (67,000 jobs nationally); cutter and paster, press clippings, DOT 249.587-014 (38,000 jobs national); and, semiconductor bonder, DOT 726.685-066 (27,000 jobs nationally). (Tr. 73-74).

The VE testified that at the unskilled level, employers tolerate between one and two unscheduled, unplanned absences per month. (Tr. 74). In response to a question from Plaintiff's counsel, the VE testified that an individual who is going to be absent five to ten days of work per month on a consistent basis and who required extra work breaks would be incapable of full-time work. (Tr. 75).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he/she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c)

and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. Claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2. Claimant has not engaged in substantial gainful activity since February 9, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. Claimant has the following severe impairments: obesity, fibromyalgia, mild lumbar disc disease, mild cervical degenerative disc disease, and headache disorder (20 CFR. § 404.1520(c) and 416.920(c)).

4. Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that Claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must be allowed the option

of sitting or standing every sixty minutes. Such work must not require operation of foot controls. Claimant must avoid all exposure to vibration, hazardous machinery, and unprotected heights. Claimant cannot climb stairs, ladders ropes, or scaffolds. She can never kneel, crouch, or crawl. She can do unskilled work that requires no more than occasional direct interaction with the general public.

6. Claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Claimant was born on ** **, 1976, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Claimant is "not disabled," whether or not Claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. Claimant has not been under a disability, as defined in the Social Security Act, from February 9, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-35).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look

into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**

**1. Credibility Assessment**

In her first assignment of error, Plaintiff contends that the ALJ erred in the assessment of her credibility. According to SSR 96-7p, 1996 WL 374186 (July 2, 1996) (as well as SSR 16-3p), evaluating an individual's alleged symptoms entails a two-step process. First, an ALJ must determine whether a claimant has a "medically determinable impairment" that could reasonably produce a claimant's alleged symptoms.[4] *Id.* at *2. The ALJ's decision clearly found the first step was satisfied and states that Plaintiff's medically determinable impairments "could reasonably be expected to cause some of the alleged symptoms." (Tr. 28). Once step one is

---

[4] SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), but the latter was in effect at the time of the June 16, 2015, hearing. Plaintiff concedes that SSR 16-3p does not apply retroactively and the court agrees. (R. 14, PageID# 925 at n. 7).

satisfied, when considering the intensity, persistence, and limiting effects of an individual's symptoms," an ALJ should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures, other than treatment, an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p at *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). "[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) ("[T]olerance of pain is a highly individual matter and a determination of disability based on pain by necessity depends largely on the credibility of the claimant," and an ALJ's credibility finding "should not lightly be discarded.")(citations omitted).

Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite *some* other evidence for denying a claim for pain in addition to

personal observation"). "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" SSR 96-7p, 1996 WL 374186 at *2.[5] Rather, an ALJ's "decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Id*. at *2. "While in theory [a court] will not 'disturb' an ALJ's credibility determination without a 'compelling reason,' *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), in practice ALJ credibility findings have become essentially 'unchallenged.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (*citing Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

Here, the ALJ expressly acknowledged she must follow a two-step process to determine whether Plaintiff's symptoms were credible. (Tr. 26). Plaintiff asserts the ALJ's reasoning was "inaccurate and inconsistent" and failed to follow the applicable regulations. (R. 14, PageID# 925). Conversely, the Commissioner asserts that the ALJ conducted a proper credibility analysis, which comported with the regulations and the Social Security Administration's policies. (R. 15, PageID# 948-955).

First, the decision provided a thorough and extensive summary of Plaintiff's alleged limitations as set forth in the hearing testimony. (*See* Tr. 27-28). The ALJ also recounted Plaintiff's alleged limitations as stated in the "Function Report – Adult" form Mausar completed

---

[5] SSR 16-3p merely replaced the term "credible" in this sentence with the terms "supported or consistent." 2016 WL 1119029 at *9.

on August 21, 2013. (Tr. 26-27, *citing* Exh. B9E). The ALJ proceeded to address the credibility

of these allegations in a lengthy analysis:

> I find Claimant's testimony of disabling pain and functional restrictions disproportionate to the objective medical evidence. The record does not contain objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged. There are not any diagnostic studies demonstrating abnormalities that might cause such severe symptoms. The physical findings in the record do not establish the existence of neurological deficits, significant weight loss, muscle atrophy, or other observable signs usually associated with protracted pain of the intensity, frequency, and severity alleged. Thus, after careful consideration of the evidence, I find that Claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> The medical evidence supports Claimant's allegations of having migraine headaches, fibromyalgia, lumbar degenerative disc disease, and obesity. It does not, however support the frequency of headaches alleged, the degree of pain and functional limitations or any side effects from medication.

> \*\*\*

> There is no doubt Claimant has pain when she has a migraine headache. She no doubt has some pain from fibromyalgia and degenerative disc disease; however, the record does not support the debilitating degree of pain she alleges. For example, A St. Francis Hospital Emergency Department report dated April 25, 2012, states that Claimant described her migraine pain 10/10 (Exhibit B3F at 36). Claimant presented to St. Francis Hospital Emergency Department complaining of a migraine headache on September 1, 2012. Associated symptoms included mild nausea and vomiting. She rated her pain at 10/10 (Exhibit B3F at 10-11); however, the emergency Department report states that Claimant's symptoms at worst were moderate in the emergency department. (*Id*. at 13). Claimant presented to St. Francis Hospital Emergency Department on November 4, 2012, complaining of a headache, which is described as moderate at worst (Exhibit B3F at 25).

> \*\*\*

> Claimant's allegations of side effects from medications are highly inconsistent with the medical evidence. For example, on February l5, 2013, Dr. Chang noted that Claimant denied any side effects from medications (Exhibit B6F at 29). Dr. Oglesby reported that Claimant denied any side effects from medication on March

11, 2013. (*Id*. at 25). On March 27, 2013, Dr. Chang reported that Claimant denied any side effects from medication. (*Id*. at 19). Claimant denied side effects from medications on April 25, 2013. (*Id*. at 12). Claimant denied side effects from medication on August 6, 2013 (Exhibit B11F at 1). Dr. Oglesby examined Claimant on October 3, 2013, and reports Claimant denied any sedation or side effects from medications (Exhibit B14F at 4). Claimant denied any side effects from medications on November 1, 2013. (*Id*. at 1). Dr. Oglesby examined Claimant on November 27, 2013, and reported Claimant denied any sedation or side effects from medication (Exhibit B15F at 16). Claimant denied any sedation or side effects of medication on December 23, 2013. (*Id*. at 12). Claimant denied any sedation or side effects of medications on March 3, 2014 (Exhibit B16F at 4), May 2, 2014. (*Id*. at 1), and July 15, 2014 (Exhibit B18F at 1). Claimant denied sedation or side effects from medications on November 6, 2014 (Exhibit B22F at 10). On January 22, 2015, Dr. Oglesby reported that Claimant denied any sedation or side effects from medications. (*Id*. at 5).

Claimant's allegations regarding inability to sit, walk, or stand for longer than ten minutes find no support in the medical evidence. Claimant's gait and muscle strength has been reported to be normal at all examinations. For example, [w]hen Dr. Liss examined Claimant on February 18, 2013, he reported she had normal gait and normal muscle strength and bulk in all muscle groups. He specifically reported 5/5 muscle strength in the left deltoid, right deltoid, left biceps, right biceps, left triceps, right triceps, left wrist extension, right wrist extension, left finger extension, right finger extension, left finger interossei are [sic], right finger interossei, left iliopsoas, right iliopsoas, left quadriceps, right quadriceps, left hamstrings, write [sic] hamstrings, left tibialis anterior, left anterior tibialis, left extensor hallucis longus, and right extensor hallucis longus. Neurological examination was within normal limits (Exhibit B5F at 13). Neither he, Dr. Chang, nor Dr. Oglesby has stated contrary findings at subsequent examinations.

Although Claimant has described daily activities that are quite limited, two factors weigh against considering these allegations to be strong evidence in favor of finding her disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Second, even if Claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to Claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, Claimant's reported limited daily activities are considered outweighed by the other factors discussed in this decision.

(Tr. 28-33).

In addition to discussing the objective medical evidence that revealed normal gait, normal

muscle strength in all areas, lack of any muscle atrophy, observations by medical personnel

inconsistent with Plaintiff's allegations, and other evidence tending to discredit the extremely restrictive limitations alleged by Plaintiff, the above cited passage reveals that the ALJ discussed several of the above-cited seven factors for finding Plaintiff less than fully credible. These included Plaintiff's daily activities, the frequency and intensity of Plaintiff's fibromyalgia and migraines, the effectiveness and side effects of medication, as well as other treatment such as epidural steroid injections. (Tr. 28-33). Plaintiff concedes the ALJ did consider some of the seven factors, but characterizes the analysis as "woefully deficient" because it did not discuss other factors. (R. 14, PageID# 926, 928). An ALJ, however, is not required to analyze all seven factors, but should consider the relevant evidence. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (Baughman, M.J.) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence"); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005) (finding that neither SSR 96-7p nor the regulations "require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination"); *Wolfe v. Colvin*, No. 4:15-CV-01819, 2016 WL 2736179 at *10 (N.D. Ohio May 11, 2016) (Vecchiarelli, M.J.); *Allen v. Astrue*, No. 5:11CV1095, 2012 WL 1142480, at *9 (N.D. Ohio Apr. 4, 2012) (White, M.J.).

Plaintiff also attempts to rebut the ALJ's analysis regarding the credibility as to the frequency of her migraines and her pain levels by pointing to her own statements made to medical providers regarding the same. (R. 14, PageID# 926-927). Plaintiff asserts that her statements to treatment providers throughout the record were consistent with her hearing testimony. *Id*. Plaintiff, however, cites no law suggesting that an ALJ *must* find a claimant credible simply because her statements regarding the severity of her symptoms may have been

consistent.[6] Plaintiff's argument essentially avers that she should have been deemed credible, rather than identifying any legal insufficiency in the ALJ's analysis. While Plaintiff points to some portions of the record not expressly addressed by the ALJ in the credibility analysis, "[t]here is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record." *Whitford v. Comm'r of Soc. Sec.*, No. 12-14761, 2014 WL 540008 at *2 (E.D. Mich. Feb. 11, 2014) (*citing Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir.2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")). "Further, this Court does 'not try the case *de novo*, resolve conflicts in evidence, or ***decide questions of credibility***.'" *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (emphasis added)). To the extent Plaintiff asks this court to construe her testimony in a more favorable light or to conduct its own credibility analysis, such an argument does not provide a basis for remand.

The ALJ's credibility discussion adequately comported with the regulations and SSR 96-7p. Thus, Plaintiff's first assignment of error is without merit.

### 2. Fibromyalgia

In the second assignment of error, Plaintiff asserts the ALJ fails to grasp the nature of fibromyalgia, noting that the "ALJ seem[ed] to expect to find objective findings, but with fibromyalgia, there are none to be found." (R. 14, PageID# 929). The Commissioner argues that the Plaintiff is incorrect in asserting that an ALJ is prohibited from considering the lack of

---

[6] This statement should not be construed as a finding that Plaintiff's testimony was consistent or inconsistent with her statements to medical personnel. Rather, the court is merely noting that consistency, while perhaps a factor as to one's reliability, does not render an ALJ's finding deficient. An ALJ could reasonably find that a claimant has consistently overstated the severity of his or her symptoms.

objective evidence in a case that involves fibromyalgia. (R. 15, PageID# 950).

In the case at bar, the ALJ specifically found that claimant suffered from fibromyalgia, and designated it as a "severe" impairment. (Tr. 22). A finding that fibromyalgia constitutes a severe impairment, however, does not equate to a finding of disability, nor does a diagnosis of fibromyalgia corroborate the severity of a claimant's pain symptoms. *See Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008) ("A diagnosis of fibromyalgia does not automatically entitle Vance to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that Vance's fibromyalgia was either improving, or, at worst, stable."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority."); *accord Foutty v. Comm'r of Soc. Sec.*, No. 5:10 CV 551, 2011 WL 2532915, at *7 (N.D. Ohio June 2, 2011) (Knepp, M.J.), *report and recommendation adopted*, 2011 WL 2532397 (N.D. Ohio June 24, 2011).

Social Security Ruling ("SSR") 12-2p, sets forth the Social Security Administration's directions for evaluating fibromyalgia. SSR 12-2p; 2012 WL 3104869 (July 25, 2012). It also sets forth the manner to evaluate a person's statements about his or her symptoms and functional limitations (*i.e.* credibility). *Id.* Essentially, ALJs are instructed to use the same method in determining credibility as set forth in SSR 96-7p. *Id.* First, the ALJ must determine whether "medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged," recognizing that fibromyalgia "satisfies the first step of our two-step process for evaluating symptoms." *Id.* Second, and more pertinent to the case at bar, SSR 12-2p specifically allows the ALJ to consider whether "*objective medical evidence* … substantiate[s] the person's statements about the intensity, persistence, and

functionally limiting effects of symptoms." *Id.* If not, the ALJ is to consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.* Therefore, Plaintiff's suggestion that the ALJ erred by considering the lack of objective evidence to support the severity of Plaintiff's pain symptoms simply because this case involves fibromyalgia is not well taken.

Moreover, this case is distinguishable from the cases upon which Plaintiff relies.[7] In *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 (6th Cir. 2007), the Sixth Circuit reversed where the ALJ appears to have questioned a claimant's *diagnosis* of fibromyalgia based on a lack of objective medical evidence. Here, the ALJ did not question that Plaintiff's fibromyalgia constituted a severe impairment.[8] In *Keating v. Comm'r of Soc. Sec. Admin.*, No. 3:13-CV-487, 2014 WL 1238611 at *6 (N.D. Ohio Mar. 25, 2014) (McHargh, M.J.), the court observed that "symptoms of fibromyalgia are often not supportable by objective medical evidence." Here, however, Plaintiff has alleged symptoms of an extreme magnitude, stating that she could only stand/walk for ten minutes at a time and sit for ten maybe twenty minutes at a time (Tr. 61), giving rise to the inference that she must lay down the vast majority of the day. While objective tests may not be useful in diagnosing fibromyalgia or corroborating the existence of its pain symptoms, this case presents a different set of facts. The ALJ here did not question the diagnosis

---

[7] The court also notes that some of the cases relied upon by Plaintiff predate SSR 12-2p.

[8] The same diagnosis issue was involved in *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815 (6th Cir. 1988), which is discussed extensively in *Rogers* and cited in Plaintiff's brief. (R. 14, PageID# 930).

of fibromyalgia, nor did she question whether Plaintiff suffers from pain as a result. Rather, she specifically found that Plaintiff suffered from fibromyalgia and stated that Plaintiff "no doubt has some pain from fibromyalgia and degenerative disc disease." (Tr. 31). However, the ALJ did explain that Plaintiff's lack of muscle atrophy, normal muscle strength, and normal gait undermines the alleged severity of her symptoms—a reasonable determination under the circumstances. (Tr. 28). The ALJ did not erroneously expect to see some medical tests demonstrating the presence of fibromyalgia. She also did not expect the objective evidence to confirm the presence or severity of Plaintiff's alleged pain. Rather, given the extremely restricted nature of Plaintiff's alleged activities and her inability to sit, stand, or walk for any significant length of time over the span of years, it was not unreasonable for the ALJ to expect that such an individual's inactivity would produce measurable deterioration in her muscle strength, mobility, or other observable clinical signs. In other words, the ALJ expected to see objective signs of Plaintiff's inactivity rather than of fibromyalgia or its associated symptoms.

Furthermore, the ALJ's expectation is supported by the opinion of Dr. James, cited above, whose opinion the ALJ accorded "substantial weight." (Tr. 33). Dr. James found Plaintiff could sit/stand/walk for six hours despite her fibromyalgia and migraines, noting that Plaintiff had normal "gait, neuro, motor function despite pain." (Tr. 136).

Therefore, the court finds Plaintiff's second assignment of error to be without merit.

## IV. Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.


s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: December 29, 2017


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.** *See United States v. Walters*, **638 F.2d 947 (6**[th] **Cir. 1981)**; *Thomas v. Arn*, **474 U.S. 140 (1985)**, *reh'g denied*, **474 U.S. 1111 (1986)**.